UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 APR 29 PM 3: 39

CLERK
BY _____
DEPUTY CLERK

MATTHEW K. DURKEE,              )
                               )
        Plaintiff,             )
                               )
    v.                         )    Case No. 2:23-cv-00274
                               )
NBT BANCORP, INC.,             )
                               )
        Defendant.             )

## ENTRY ORDER GRANTING DEFENDANT NBT BANCORP, INC.'S MOTION TO STAY THE ACTION AND REFER THE MATTER TO ARBITRATION
(Doc. 10)

Plaintiff Matthew K. Durkee brings this action against Defendant NBT Bancorp, Inc. ("NBT"), seeking damages for NBT's alleged conversion of Plaintiff's assets. Pending before the court is NBT's motion to stay and compel arbitration, which argues the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 2, et seq., requires the court to compel Plaintiff to present his claim for arbitration because Plaintiff's claim falls under the arbitration clause of his employment contract with NBT. (Doc. 10.) Plaintiff opposed the motion on September 26, 2023 (Doc. 11), and NBT replied on October 10, 2023 (Doc. 12). The court held oral argument on November 9, 2023, at which time the pending motion was taken under advisement.

Plaintiff is represented by Pietro J. Lynn, Esq. NBT is represented by David V. Kirby, Esq., and Lawrence Peikes, Esq.

## I.    Factual Background.

NBT, a New York bank registered to do business in Vermont, hired Plaintiff in 2009 as Senior Vice President and later promoted him to Executive Vice President and President of New England. Plaintiff alleges that, as a term of his hiring in 2009, NBT agreed to pay Plaintiff "an amount 'to be determined' as a pension replacement (deferred

compensation) to compensate him for the pension payments he forfeited by accepting an employment offer from [NBT]." (Doc. 7 at 1, ¶ 4.) In 2016, NBT memorialized the terms of Plaintiff's employment as Executive Vice President in an employment agreement (the "Employment Agreement").

The Employment Agreement contains an arbitration clause (the "Arbitration Clause"), which states:

> Subject to the right of each party to seek specific performance (which right shall not be subject to arbitration), if a dispute arises out of or is in any way related to this Agreement or the asserted breach thereof, such dispute shall be referred to arbitration before the American Arbitration Association the ("AAA") pursuant to the AAA's National Rules for the Resolution of Employment Disputes (the "Arbitration Rules"). A dispute subject to the provisions of this Section 15 will exist if either party notifies the other party in writing that a dispute subject to arbitration exists and states, with reasonable specificity, the issue subject to arbitration (the "Arbitration Notice"). The parties agree that, after the issuance of the Arbitration Notice, the parties will try in good faith between the date of the issuance of the Arbitration Notice and the date the dispute is set for arbitration to resolve the dispute by mediation in accordance with the Arbitration Rules. If the dispute is not resolved by the date set for arbitration, then any controversy or claim arising out of this Agreement or the asserted breach hereof shall be resolved by binding arbitration and judgment upon any award rendered by arbitrator(s) may be entered in a court having jurisdiction. . . . Any provisions in this Agreement to the contrary notwithstanding, this Section 15 shall be governed by the [FAA], and the parties have entered into this Agreement pursuant to such act.

(Doc. 10-3 at 15, ¶ 15) (emphasis omitted). The Employment Agreement includes a two-year non-competition clause to be construed under New York law (the "Non-Competition Clause").

Over the course of Plaintiff's employment with NBT, he received NBT stock, including 4,424 shares in March 2020. Plaintiff asserts he also met the requirements of NBT's Omnibus Incentive Plan for the 4,424 shares to fully vest on May 31, 2021.

Plaintiff contends that he notified NBT of his intention to resign sometime in 2020 and that his resignation entitled him to certain benefits under the Employment Agreement. On December 23, 2020, Plaintiff and NBT memorialized the terms of

2

Plaintiff's resignation in a transition agreement (the "Transition Agreement"). The
Transition Agreement provides that Plaintiff will transition out of his current role
effective January 1, 2021 and retire effective May 31, 2021. Pursuant to the Transition
Agreement, Plaintiff "waive[d] any right to terminate his employment for Good Reason
under his Employment Agreement, any restricted stock unit award agreements, or any
other agreement with [NBT] or its affiliates[.]" (Doc. 10-2 at 2.) The Transition
Agreement states that Plaintiff will continue to receive his base salary until the effective
retirement date. It further provides that his restricted stock units "will continue to vest
according to their vesting schedules as provided under separate cover" not to "extend
beyond [Plaintiff's] [r]etirement [d]ate" and Plaintiff "will receive a lump sum payment
in an amount no less than $340,000 in settlement of the income replacement provision
provided for in his offer letter dated March 20, 2009, expected to vest at age 62." *Id.* This
lump sum payment "may be placed in a deferred compensation account or paid in
January 2022 or upon request[.]" *Id.*

The Transition Agreement incorporates by reference several provisions of the
Employment Agreement, including the Arbitration Clause and the Non-Competition
Clause, and states these provisions survive termination of the Employment Agreement.
Plaintiff alleges he and NBT knew when executing the Non-Competition Clause that it
would not be enforceable under New York law.

On June 1, 2021, NBT paid a $250,000 first installment of Plaintiff's income
replacement benefit as a contribution to his deferred compensation account. On
December 1, 2021, NBT paid the remaining $90,000 income replacement benefit owed to
Plaintiff in cash. NBT was the custodian of Plaintiff's deferred compensation plan, but
Plaintiff had control over the deferred compensation account in which the funds were
placed. Plaintiff alleges the $340,000 pension replacement and the 4,424 shares were
included as compensation on his 2021 Federal Form W-2.

On January 21, 2022, NBT notified Plaintiff that it considered him to be in breach
of the Non-Competition Clause as incorporated in the Transition Agreement and warned
that if Plaintiff did not cease his competitive activities, he would forfeit the amounts due

3

under the Transition Agreement. Plaintiff, by his own admission, "chose to ignore" NBT's notice. (Doc. 7 at 3, ¶ 14.)

Plaintiff alleges that NBT "took $258,481.67 from [Plaintiff's] pension replacement deferred compensation account[]" on January 4, 2022[1] and "found a way to persuade E-Trade to transfer the 4,424 shares held by [Plaintiff] in his account with E-Trade to [NBT]." *Id.* at 4, ¶¶ 16-17. He asserts NBT converted his assets "for its own use[,]" causing him "financial harm[,]" and NBT "acted with actual malice" in doing so. *Id.* at ¶¶ 21-22. Plaintiff alleges NBT knew it did not have a legal right to the assets it took. The Complaint states that Plaintiff's "common law conversion[]" action "does not arise from the Transition Agreement." *Id.* at ¶ 20. Plaintiff seeks compensatory and punitive damages.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

When considering a motion to compel arbitration, the court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits[,]" and "draw all reasonable inferences in favor of the non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks, citation, and ellipses omitted).

NBT argues the court must compel arbitration because the Arbitration Clause, incorporated by reference into the Transition Agreement, manifests the parties' intent for an arbitrator to decide whether a claim is subject to the Arbitration Clause, an issue commonly referred to as "arbitrability." It also asserts that, even if the court concludes the Arbitration Clause does not clearly delegate arbitrability to the arbitrator, Plaintiff has not overcome the presumption that his claim is arbitrable because his claim arises out of the Transition Agreement. Plaintiff counters that the Arbitration Clause does not manifest

---

[1] The Complaint states "January 4, 2021," (Doc. 7 at 4, ¶ 16), but this appears to be a typographical error.

4

the parties' intent for the arbitrator to decide arbitrability and that his conversion claim is not arbitrable because it is unrelated to the terms of either the Transition Agreement or the Employment Agreement.

The FAA "requires the federal courts to enforce arbitration agreements, reflecting Congress'[s] recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) (internal quotation marks and citation omitted). Congress's "clear" intent in passing the FAA was "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). "To achieve these goals, [the FAA] provides that arbitration clauses in commercial contracts 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (citing 9 U.S.C. § 2).[2]

"By its terms," the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). In reviewing motions to compel arbitration, courts "must therefore determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; and, (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable." *Daly*, 939 F.3d at 421 (alterations, citation, and internal quotation marks omitted). The first requirement has been met because there is an Arbitration Clause and neither party challenges its validity. The third requirement is not relevant because Plaintiff asserts no federal statutory claims.

---

[2] "[T]he FAA applies generally to arbitration clauses contained in contracts 'evidencing a transaction involving commerce,'" *Islam v. Lyft, Inc.*, 524 F. Supp. 3d 338, 350 (S.D.N.Y. 2021) (emphasis omitted) (quoting 9 U.S.C. § 2), which includes employment contracts, *see Suqin Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 386 (S.D.N.Y. 2017) ("The FAA applies with equal force in the employment context[.]"). The FAA does not apply to employment contracts for "transportation workers[,]" which is not the case here. *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001).

5

The only remaining issue is whether Plaintiff's conversion claim is within the scope of the Arbitration Clause.

## B.     Whether the Court Should Refer the Issue of Arbitrability to Arbitration.

The parties dispute whether the court or an arbitrator should determine arbitrability. NBT argues that the broad Arbitration Clause, which incorporates procedural rules permitting the arbitrator to determine issues of arbitrability, establishes a clear and unmistakable contractual intent to have the arbitrator decide arbitrability. Plaintiff counters that a necessary condition for the Arbitration Clause has not been satisfied and that the Arbitration Clause is at best ambiguous regarding who should determine arbitrability.

"Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019). Questions of arbitrability "include questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 105 (2d Cir. 2023) (internal quotation marks omitted) (quoting *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 34 (2014)). "'[T]hreshold questions of arbitrability[]' . . . 'presumptively should be resolved by the court and not referred to the arbitrator.'" *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (quoting *Dr. 's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019)). Courts must decide issues of arbitrability "unless there is clear and unmistakable evidence" the parties intended the arbitrator to do so. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations adopted) (internal quotation marks and citation omitted).

"In determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative." *DDK Hotels, LLC*, 6 F.4th at 318. Courts must generally "apply ordinary state-law principles that govern the formation

6

of contracts[,]" *First Options of Chi., Inc.*, 514 U.S. at 944, however, "rarely do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability." *Bucsek*, 919 F.3d at 191. "In the absence of such clear language, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them." *DDK Hotels, LLC*, 6 F.4th at 318 (internal quotation marks and citation omitted). Evidence of intent to arbitrate arbitrability includes "[b]road language expressing an intention to arbitrate all aspects of all disputes[.]" *Bucsek*, 919 F.3d at 191. Similarly, "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, that incorporation may serve 'as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator.'" *DDK Hotels, LLC*, 6 F.4th at 318 (quoting *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005)).

The Arbitration Clause pertains to any dispute that "arises out of or is in any way related to [the Employment Agreement][.]" (Doc. 10-3 at 15, ¶ 15.) This broad language evinces "an intention to arbitrate all aspects of all disputes[.]" *Bucsek*, 919 F.3d at 191.[3] The Arbitration Clause also incorporates the American Arbitration Association's National Rules for the Resolution of Employment Disputes (the "AAA Rules"), which contain provisions that "explicitly empower an arbitrator to resolve questions of arbitrability[.]" *DDK Hotels, LLC*, 6 F.4th at 318.[4] Although the Arbitration Clause does

[3] *See, e.g., Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*, 2023 WL 1382134, at *2 (S.D.N.Y. Jan. 31, 2023) (describing arbitration clause that covered "[a]ny controversy arising out of or related to this Agreement" as "broad"); *SiriusPoint Ltd. v. Davis*, 2023 WL 4447098, at *5 (S.D.N.Y. July 11, 2023) (concluding clause requiring arbitration of "any . . . dispute arising out of or relating to this Plan or the adoption, breach, termination or validity thereof[]" was "the paradigm of a broad clause[]") (emphasis, internal quotation marks, and citations omitted).

[4] AAA Rule 6.a states, "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." Am. Arb. Ass'n, Employment Arbitration Rules and Mediation Procedures Rule 6.a. (Effective July 1, 2015); *see also id.* Rule 1. (explaining that the "National Rules for the Resolution of Employment Disputes" was renamed the "Employment Arbitration Rules and Mediation Procedures" and that "[a]ny arbitration agreements providing for arbitration under [the AAA's] National Rules for the Resolution of Employment Disputes shall be administered pursuant to the[] Employment Arbitration Rules and Mediation Procedures[]").

7

not cite any specific provision of the AAA Rules, an arbitration clause is not required to reference a specific rule provided it reflects an intent, as is present here, to include the AAA Rules *in toto*. *See Contec Corp.*, 398 F.3d at 208 (concluding wholesale incorporation of AAA Commercial Arbitration Rules indicated intent to delegate issues of arbitrability to arbitrator); *see also Gordon v. Wilson Elser Moskowitz Edelman & Dicker LLP*, 2023 WL 2138693, at *7 (S.D.N.Y. Feb. 21, 2023) (stating an "express delegation clause . . . is not required"). Although breadth or incorporation of the AAA Rules independently may not be enough, where a "broad" arbitration clause that "expresses the intent to arbitrate all aspects of all disputes[]" is "coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability[,] [this] constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *DDK Hotels, LLC*, 6 F.4th at 318-19.

Plaintiff argues that a "necessary condition" (Doc. 11 at 5) has not been satisfied because neither party "'notifie[d] the other party in writing that a dispute subject to arbitration exists[,]'" *id.* (quoting Doc. 10-3 at 15, ¶ 15), and thus there is no "dispute" within the language of the Arbitration Clause. Although "courts presume that the parties intend courts, not arbitrators, to decide disputes about 'arbitrability[,]' . . . courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." *Olin Holdings Ltd.*, 73 F.4th at 105 (alteration adopted) (internal quotation marks omitted) (quoting *BG Grp., PLC*, 572 U.S. at 34).

> These procedural preconditions "include claims of waiver, delay, or a like defense to arbitrability," as well as "the satisfaction of prerequisites such as time limits, *notice*, laches, estoppel, and other conditions precedent to an obligation to arbitrate," whose effect is to "determine[] when the contractual duty to arbitrate arises, not whether there is a contractual duty to arbitrate at all."

*Id.* (emphasis supplied) (quoting *BG Grp., PLC*, 572 U.S. at 35). The Arbitration Clause addresses procedural prerequisites to arbitrability. In the event of a disagreement whether

they have been satisfied, the Arbitration Clause refers that issue to arbitration. *See* Doc.
10-3 at 15, ¶ 15 ("If the dispute is not resolved by the date set for arbitration, then any
controversy or claim arising out of this Agreement or the asserted breach hereof shall be
resolved by binding arbitration and judgment upon any award rendered by arbitrator(s)
may be entered in a court having jurisdiction."); *see also Gordon*, 2023 WL 2138693, at
\*8 (concluding where arbitration clause included procedures for pre-arbitration mediation
that party's failure to "engage in pre-arbitration mediation is a question of procedural
arbitrability and thus must be determined by an arbitrator[]") (internal quotation marks
and citation omitted).

Plaintiff further contends that the Arbitration Clause's definition of "dispute" does
not apply to his claim which sounds not in contract but in equity. *See Bucsek*, 919 F.3d at
195 (stating that, where "agreement cannot be reasonably interpreted to provide for
arbitration of the dispute[,]" the language of the agreement weighs against "construing an
agreement as providing for arbitration of arbitrability[]"). The Arbitration Clause
includes any dispute that "arises out of or is in any way related to" the Employment
Agreement or the Transition Agreement. (Doc. 10-3 at 15, ¶ 15.) In order to be "related
to" these agreements, a claim need not sound in contract. To the contrary, there is no
limitation on the types of claims or legal theories to which it may pertain provided it
arises from or is related to Plaintiff's employment. *See Collins & Aikman Prods. Co. v.
Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (explaining that plaintiff's
"characterization of [the claims] in the pleading[]" is not controlling, instead, the court
must "look to the conduct alleged"); *see also Monk v. Goldman Sachs & Co.*, 2023 WL
22618, at \*6 (S.D.N.Y. Jan. 3, 2023) (stating that "tort claims may still 'arise out of'
employment if the claims 'involve significant aspects of the employment relationship[]'")
(quoting *Fleck v. E.F. Hutton Grp.*, 891 F.2d 1047, 1052 (2d Cir. 1989)). Plaintiff's
entitlement to retain money and stock from NBT is defined in the Transition Agreement,
and NBT's basis for revoking this entitlement is the Non-Competition Clause
incorporated into the Transition Agreement. The dispute is thus squarely within the
Arbitration Clause.

9

Because an arbitrator and not the court must decide whether Plaintiff's claims are subject to arbitration, NBT's motion to compel arbitration is GRANTED. *See DDK Hotels, LLC*, 6 F.4th at 316-17 ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts *must* [therefore] respect the parties' decision as embodied in the contract.") (emphasis supplied) (alteration in original) (internal quotation marks omitted) (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019)).

NBT has requested a stay pending resolution of Plaintiff's claims by an arbitrator pursuant to 9 U.S.C. § 3 which provides that a court, "upon being satisfied" that the claims are referrable to arbitration, "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" The Second Circuit has held that § 3 requires the court to enter a stay "when all of the claims in an action have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015); *but cf. Boustead Sec., LLC v. Leaping Grp. Co.*, 656 F. Supp. 3d 447, 452 (S.D.N.Y. 2023) (noting that court retains discretion to dismiss rather than stay action only "if no party has requested a stay[]"). NBT's motion to stay is therefore GRANTED.

## CONCLUSION

For the reasons stated above, the court GRANTS NBT's motion to stay the action and refer the matter to arbitration (Doc. 10).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 29ᵗʰ day of April, 2024.

Christina Reiss, District Judge
United States District Court

10