UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 DEC 16  PM 4: 40**

CLERK

BY

DEPUTY CLERK

MATTHEW DURKEE,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )    Case No. 2:23-cv-00274-cr
                                   )
NBT BANCORP., INC.,                )
                                   )
        Defendant.                 )

**OPINION AND ORDER
DENYING NBT'S MOTION TO VACATE, IN PART,
THE ARBITRATION AWARD**
(Doc. 18)

Plaintiff Matthew Durkee filed suit against Defendant NBT Bancorp., Inc.,

("NBT"), for conversion. This court referred the case to arbitration on April 29, 2024,

and on July 2, 2025, the arbitrator ("Arbitrator") entered a final award (the "Final

Award"). On July 3, 2025, NBT filed a motion to vacate, in part, the arbitration award.

(Doc. 18.) Mr. Durkee opposed the motion on July 17, 2025, (Doc. 21), and NBT replied

on July 31, 2025, (Doc. 22), at which point the court took the pending motion under

advisement.

Mr. Durkee is represented by Pietro J. Lynn, Esq. NBT is represented by David V.

Kirby, Esq., and Lawrence Peikes, Esq.

**I.      Factual and Procedural Background.**

NBT is a New York bank registered to do business in Vermont. In an offer letter

dated March 9, 2009, NBT offered Mr. Durkee a position as Corporate Senior Vice

President, which Mr. Durkee accepted. NBT's offer letter provided the terms of Mr.

Durkee's employment, including his compensation package and benefits. The offer letter

contained a provision titled "Defined Benefit Pension Plan," wherein NBT agreed to

"increase [Mr.] Durkee's service credits or provide some type of supplemental retirement

benefit to provide him with an expected replacement ration of 30% at age 62, subject to

certain vesting requirements." (Doc. 19-3 at 9) (alteration adopted) (internal quotation
marks and citation omitted). This provision was designed to offset the anticipated
diminution in value that Mr. Durkee's pension would experience by leaving his prior
employer.

Upon joining NBT, Mr. Durkee expanded NBT's presence in the Northeast region,
adding branches in Vermont, acquiring a bank in New Hampshire, and opening a loan
production office in Maine. Over the subsequent years, Mr. Durkee was promoted, and in
2016, when NBT's CEO retired, NBT "seriously considered [Mr.] Durkee as a
replacement." *Id.* at 10. Although NBT ultimately appointed John Watt, Jr., as CEO on
May 3, 2016, in order to retain Mr. Durkee, on the same day, "NBT awarded [him]
15,000 restricted stock units, or RSUs, which were scheduled to vest in their entirety on
May 15, 2021, subject to the condition that [he] remain in NBT's continuous employ." *Id.*

In 2016, Mr. Durkee was Executive Vice President of NBT, President of New
England for NBT, and a member of NBT's Executive Management Team (the "EMT").
Mr. Durkee, along with other members of the EMT, met weekly with Mr. Watt to discuss
a wide range of NBT matters. These matters included NBT's current and projected
financial performance, growth opportunities, acquisition targets, marketing initiatives,
and business strategy. Due to the confidential nature of the meetings, at the end of 2016,
NBT presented a comprehensive employment agreement (the "Employment Agreement")
to Mr. Durkee and Mr. Watt's other direct reports. In late 2017, Mr. Durkee executed the
Employment Agreement which includes, in relevant part, the following non-competition
covenant:

> Executive agrees that notwithstanding the termination of this Agreement
> for any reason, from the Commencement Date until the second (2nd)
> anniversary of the Termination Date, the Executive shall not, directly or
> indirectly, on behalf of himself or any other person or entity, without the
> written consent of the Company: . . . become an officer, employee,
> consultant, director, or trustee of any savings bank, savings and loan
> association, savings and loan holding company, bank or bank holding
> company, where such position entails providing services to such company
> in any city, town, or county in which the Company or its affiliates has an
> office, determined as of the Termination Date, where Executive's position

2

or service for such business is competitive with or otherwise similar to any
of Executive's positions or services for the Company or its affiliates[.]

(Doc. 10-3 at 6, § 4(b)(i).)

The Employment Agreement contains a mandatory arbitration clause for disputes
"aris[ing] out of or [] in any way related to this Agreement[,]" *id.* at 15, § 15, and a
choice of law clause providing that it "shall be governed by, construed, and enforced in
accordance with the laws of the State of New York, without giving effect to the principles
of conflicts of law thereof." *Id.* at 13, § 11.

On March 24, 2020, Mr. Watt informed Mr. Durkee via letter that NBT's
Compensation and Benefits Committee (the "Committee") granted him a 2020
Performance Award of NBT stock "based on the target level of 3,403 shares[,]" (Doc. 19-
3 at 13) (internal quotation marks and citation omitted), which was subject to change
based on NBT's 2020 performance and a clawback based on NBT's 2021 performance,
which was scheduled to vest on January 15, 2023. After NBT's 2020 financial results
were finalized in March 2021, Mr. Durkee was to receive 4,424 Restricted Stock Units
("RSUs") under the 2020 Performance Award. The RSUs remained subject to a clawback
if NBT's 2021 performance deteriorated, which was to be determined at the Committee's
March 2022 meeting.

On September 30, 2020, NBT advised Mr. Durkee that his Employment
Agreement would not be renewed after its expiration on December 30, 2020. NBT sought
to remove Mr. Durkee from the EMT but retain him as a lower-level employee. In
response, Mr. Durkee invoked a clause of the Employment Agreement which entitles an
executive "to receive . . . a lump sum payment equal to twice [the] Executive's Base
Salary" in the event that the executive is terminated without cause or resigns for good
reason. (Doc. 10-3 at 6, § 6(b).) NBT disagreed that its refusal to renew Mr. Durkee's
Employment Agreement warranted application of this clause. The parties resolved their
dispute in an Agreement and Letter of Understanding Concerning Transition and
Retirement (the "Transition Agreement") dated December 23, 2020.

The Transition Agreement, in relevant part, provides:

3

The Parties agree that Executive's retirement and last day of employment
with [NBT] will be May 31, 2021 ("Retirement Date") and Executive
agrees to resign from any and all offices and positions of any nature or
description with [NBT], its affiliates, and any of their respective
subsidiaries as of such date; . . .

Effective January 1, 2021, Executive will no longer receive the provisions
and benefits provided for under the Employment Agreement . . . . Effective
January 1, 2021[,] Executive's title will change to Strategic Advisor and
Executive will assist in the transition of his duties. Transition duties will be
expected to take up to [thirty] days from the date of this Agreement and
Executive agrees to cooperate in the transition of his roles.

(Doc. 10-2 at 1, § 1(a)-(b).)

The Transition Agreement clarified that Mr. Durkee remained subject to the non-

competition clause of the Employment Agreement and incorporated the Employment

Agreement's choice of law and arbitration clauses by reference. The Transition

Agreement provided Mr. Durkee with the following benefits:

Executive will continue to receive his current base salary in effect as of the
date of this agreement until the Retirement Date payable in the normal
course in accordance with [NBT]'s standard payroll practices.

* * *

No further [RSUs] or other equity incentive awards will be granted;
however, all current [RSUs] will continue to vest according to their vesting
schedules as provided under separate cover including the May 3, 2016
[RSU] Award Agreement. All rights with respect to such [RSUs] will be
determined under the terms and conditions of the applicable [NBT]
Omnibus Incentive Plan and the award agreements and other documents
governing such awards. However, in no event shall the full vesting of all
awards extend beyond the Executive's Retirement Date.

* * *

Executive will receive a lump sum payment in an amount no less than
$340,000 in settlement of the income replacement provision provided for in
his offer letter dated March 20, 2009, expected to vest at age [sixty-two].
The final amount will be calculated at the Retirement Date and paid in
accordance with Internal Revenue Code Section 409A. It may be placed in
a deferred compensation account or paid in January 2022 or upon request[.]

*Id.* at 2, § 2(a), (c), (f).

4

In accordance with the Transition Agreement, on December 31, 2020, Mr. Durkee submitted a written election to NBT wherein he elected to have $250,000 of his $340,000 lump sum paid to a deferred compensation account. NBT deposited that $250,000 into a "Rabbi Trust" administered by Epic Advisors, Inc., an NBT-owned company.[1] NBT paid Mr. Durkee the remaining $90,000 of the lump sum through a cash payment in December 2021.

Shortly thereafter, on January 3, 2022, and before the expiration of the Employment Agreement's non-competition covenant, Mr. Durkee began working as Regional President of New England at Community Bank, a competitor of NBT. The following day, on January 4, 2022, NBT withdrew the funds in Mr. Durkee's deferred compensation account totaling $258,481.67 and transferred the money to an NBT account. NBT demanded Mr. Durkee comply with the non-competition covenant and warned that if he did not comply, he would forfeit further benefits under the Transition Agreement. Mr. Durkee continued working at Community Bank, and NBT withheld the deferred compensation account funds from him.

On March 21, 2022, the Committee held its annual meeting to, in part, approve NBT's 2020 performance awards. At the meeting, NBT executives decided that due to his breach of the non-competition covenant, Mr. Durkee was no longer eligible to receive his 4,424 RSUs under his 2020 Performance Award. On May 17, 2022, NBT canceled the 4,424 RSUs awarded to Mr. Durkee.

On June 30, 2023, Mr. Durkee filed suit against NBT in the Vermont Superior Court. In his Complaint, Mr. Durkee asserted a single claim of conversion against NBT, alleging that NBT "st[ole] assets owned by Mr. Durkee in order to punish him in an extra-contractual manner[]" including taking "$258,481.67 from Mr. Durkee's pension replacement deferred compensation account[]" and "transfer[ring] the 4,424 [RSUs] held

_____

[1] The Arbitrator defined a Rabbi Trust as "a commonly[] used mechanism for deferred compensation and deferred taxation, in which funds held by the trust are out of reach of the employer, but are subject to the claims of the employer's creditors in the event of bankruptcy or insolvency." (Doc. 19-2 at 14) (internal quotation marks and citations omitted).

5

by Mr. Durkee[.]" (Doc. 7 at 4, ¶¶ 16-17.) Mr. Durkee claimed that the Transition Agreement did not provide a basis for NBT to take the deferred compensation account funds or RSUs and, therefore, "[NBT] converted Mr. Durkee's assets . . . for its own use." *Id.* at ¶ 21.

On August 7, 2023, NBT removed the action to this court based on diversity jurisdiction. On September 13, 2023, NBT moved to compel arbitration because the Employment Agreement and Transition Agreement provided for mandatory arbitration for disputes arising out of their terms. Thereafter, NBT filed a counterclaim for breach of contract, alleging that Mr. Durkee breached the non-competition covenant. On April 29, 2024, this court issued an Entry Order granting NBT's motion and referring the matter to arbitration.

On September 26, 2024, Mr. Durkee submitted a demand for arbitration (the "Demand for Arbitration") which "incorporates by reference [and] restates the facts set forth in the Complaint filed in the Addison Superior Court and already in the possession of the parties and Arbitrator." (Doc. 19-1 at 2, ¶ 1.) NBT and Mr. Durkee submitted their arbitration briefs on May 23, 2025.

On June 11, 2025, the Arbitrator entered an interim award (the "Interim Award"), finding that Mr. Durkee breached the non-competition clause and NBT wrongfully took Mr. Durkee's deferred compensation account funds. In the Interim Award, the Arbitrator summarized NBT's position as follows:

> NBT disputes Mr. Durkee's contention that it converted [his] assets, claiming that Mr. Durkee's violation of the non-competition agreement "forfeited" any right of Mr. Durkee to the disputed deferred compensation account and [RSUs]. NBT contends that contract principles, not tort law, govern this case and that Mr. Durkee attempted to retain the benefits of the [Transition Agreement] without performing his non-competition obligations. NBT asserts that its taking of the deferred compensation funds and [RSUs] was a lawful refusal to perform by a contracting party following a material breach of the underlying contract. NBT also asks for nominal damages and an award of attorney['s] fees; the Transition Agreement authorizes an award of attorney['s] fees for the prevailing party.

(Doc. 19-4 at 4.) On July 2, 2025, the Arbitrator entered the Final Award which awarded Mr. Durkee $339,743.99, comprised of the deferred compensation account funds totaling $258,481.67 and pre-judgment interest in the amount of $81,262.32.

With respect to NBT's counterclaim for breach of contract, the Arbitrator found the non-competition covenant to be fully enforceable under New York law and determined Mr. Durkee breached the covenant by taking a position with Community Bank. The Arbitrator awarded NBT $1 in nominal damages for its breach of contract counterclaim because "NBT presented no proof of damages it may have incurred from Mr. Durkee's violation of the non-competition agreement." *Id.* at 22.

With respect to Mr. Durkee's claim for conversion, the Arbitrator observed that "this case is about rights under the [p]arties' contract, not about tortious conversion[,]" *id.* at 12, and "Mr. Durkee's assertion that this is really a tort claim for conversion is an attempt to avoid contractual obligations (including the obligation to arbitrate) imposed by the Termination Agreement." *Id.* The Arbitrator explained his conclusion as follows:

> [T]his case is about rights under the Parties' contract, not about tortious conversion.
>
>> Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, conversion, and other torts are generally precluded, unless based on a duty independent of the contract. *See N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308 (Ct. App. 1995); *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). As a result, "causes of action . . . based on the same facts as the cause of action to recover damages for breach of contract" generally should be dismissed as duplicative of the contract claim. *Edem v. Grandbelle Int'l, Inc.*, 988 N.Y.S.2d 244, 245 (2d Dep't 2014). *Novick v. AXA Network, LLC*, 714 F. App'x 22, 24 (2d Cir. 2017) (Summary Order).

*Id.* at 12.

Citing liberal pleading standards, the Arbitrator determined he could decide Mr. Durkee's claim on contract law principles rather than tort law principles because "Mr. Durkee has consistently claimed that the taking of his deferred compensation was wrongful. His labeling that claim as conversion . . . does not defeat his underlying factual assertions of NBT misconduct." *Id.* at 13. "Applying . . . contract law principles," the Arbitrator determined that NBT improperly diverted the funds from Mr. Durkee's deferred compensation account because "NBT's taking of the deferred compensation was not a withholding of future performance." (Doc. 19-4 at 13-14.) Instead, "[i]t was an interception of Mr. Durkee's funds that NBT had already paid to him, and an attempt by NBT to undo performance NBT had already rendered." *Id.* at 14. The Arbitrator observed that NBT's "assertion that the funds never left NBT's possession or control is plainly wrong and decisive: NBT took back money it had already paid to Mr. Durkee." *Id.* at 12.

Applying contract principles, the Arbitrator found that NBT properly canceled the delivery of 4,424 RSUs to Mr. Durkee because RSUs are a promise of future stock shares. Even though the Transition Agreement provides for the RSUs to vest on May 31, 2021, almost a year before they were canceled, "it was a vested promise of future performance, not a completed conveyance of the actual stock[,]" which NBT could properly reduce or eliminate as determined by the Committee in its March 2022 meeting. *Id.* at 19.

In arbitration, both Mr. Durkee and NBT requested an award of attorney's fees under the Employment Agreement's arbitration clause, as incorporated by reference in the Termination Agreement, which provides:

> In the event litigation is commenced to enforce any of the provisions hereof, or to obtain declaratory relief in connection with any of the provisions hereof, the prevailing party shall be entitled to recover reasonable attorney['s] fees. In the event this Agreement is asserted in any litigation as a defense to any liability, claim, demand, action, cause of action, or right asserted in such litigation, the party prevailing on the issue of that defense shall be entitled to recovery of reasonable attorney['s] fees.

(Doc. 10-3 at 16, § 16.) The Arbitrator refused to award either party attorney's fees, finding that neither Mr. Durkee nor NBT qualified as the "prevailing party":

8

Each Party achieved victories but suffered defeats in this litigation. For its part, NBT successfully established that Mr. Durkee violated his non-competition agreement and that NBT lawfully cancel[]ed the delivery of stock shares worth $171,032.00. NBT also successfully enforced the arbitration provision of the agreements. Mr. Durkee failed in his efforts to avoid arbitration and to recover anything for the failure to deliver stock shares. Mr. Durkee did, however, succeed in recovering his deferred compensation account. The outcome of this litigation is mixed and does not decidedly favor either Party. Therefore, I decline to award attorney['s] fees.

(Doc. 19-4 at 23).

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

"It is well established that courts must grant an arbitration [] decision great deference." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003). There is a "strong federal policy favoring arbitration, the enforcement of arbitration agreements[,] and the confirmation of arbitration awards." *Pike v. Freeman*, 266 F.3d 78, 89 (2d Cir. 2001) (citation omitted). The review of arbitration awards is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) (citation omitted).

"A party petitioning a federal court to vacate an arbitral award bears the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law." *Duferco Int'l Steel Trading*, 333 F.3d at 388. "The Federal Arbitration Act ('FAA') provides four bases upon which a federal district court may vacate an arbitration award." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 108 (2d Cir. 2019). These grounds for vacatur include, under 9 U.S.C. § 10(a)(4), when an arbitrator "exceed[s] [his or her] powers, or so imperfectly execute[s] them that a mutual, final, and definite award upon the subject matter submitted was not made." *Id.* at 108-09 (internal quotation marks omitted) (quoting 9 U.S.C. § 10(a)(4)).

In addition to the grounds for vacating an arbitration award enumerated in the FAA, the Second Circuit has "held that 'as judicial gloss on the specific grounds for vacatur of arbitration awards' in the FAA, an arbitrator's 'manifest disregard' of the law

... 'remains a valid ground for vacating arbitration awards.'" *Seneca Nation of Indians v. New York*, 988 F.3d 618, 625 (2d Cir. 2021) (alteration adopted) (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451-52 (2d Cir. 2011)). However, "[a] litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss*, 939 F.3d at 109 (internal quotation marks omitted) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010)).

Judicial review under the manifest disregard standard is "highly deferential to the arbitral award[,]" *Duferco Int'l Steel Trading*, 333 F.3d at 389, and courts "will uphold an arbitration award under this standard so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'" *Weiss*, 939 F.3d at 109 (quoting *Schwartz*, 665 F.3d at 452); *Matter of Arb. No. AAA13-161-0511-85 Under Grain Arb. Rules*, 867 F.2d 130, 133 (2d Cir. 1989) (stating that manifest disregard of the law is "a 'severely limited' standard of judicial review[]"). "Vacatur is only warranted, by contrast, 'when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice.'" *Weiss*, 939 F.3d at 109 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).

### B.   Whether the Arbitrator Exceeded His Authority.

"The Second Circuit has 'consistently accorded the narrowest of readings to the FAA's authorization to vacate awards pursuant to § 10(a)(4).'" *Caremark, L.L.C. v. New York Cancer & Blood Specialists*, 740 F. Supp. 3d 340, 352 (S.D.N.Y. 2024) (quoting *T.Co Metals, LLC*, 592 F.3d at 342). Under 9 U.S.C. § 10(a)(4), a court may vacate an arbitration award "where the arbitrator[] exceeded [his or her] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." In determining whether an arbitrator exceeded his or her authority, the focus is "whether the arbitrator[] had the power based on the parties' submissions or the

10

arbitration agreement, to reach a certain issue, not whether the arbitrator[] correctly
decided that issue." *Banco de Seguros del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255,
262 (2d Cir. 2003) (internal quotation marks and citations omitted).

"New York law gives arbitrators substantial power to fashion remedies that they
believe will do justice between the parties[]" and "fashion relief that a court might not
properly grant." *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 689 F.2d 301, 306 (2d Cir.
1982). "[A]s long as the arbitrator is even arguably construing or applying the contract
and acting within the scope of his [or her] authority, a court's conviction that the
arbitrator has committed serious error in resolving the disputed issue does not suffice to
overturn his [or her] decision." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir.
2011) (internal quotation marks omitted) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC
Nat'l Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009)). "Thus, in considering a section 10([a])(4)
challenge, 'the principal question for the reviewing court is whether the arbitrator's
award draws its essence' from the agreement to arbitrate, 'since the arbitrator is not free
merely to dispense his [or her] own brand of industrial justice.'" *ReliaStar Life Ins. Co. of
N.Y.*, 564 F.3d at 85 (alteration adopted) (citation omitted).

"[A]n arbitrator may exceed [his or] her authority by, first, considering issues
beyond those the parties have submitted for [his or] her consideration, or, second,
reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*,
646 F.3d at 122. "The scope of authority of arbitrators generally depends on the intention
of the parties to an arbitration, and is determined by the agreement or submission." *Loc.
1199, Drug, Hosp. & Health Care Emps. Union, RWDSU, AFL-CIO v. Brooks Drug Co.*,
956 F.2d 22, 25 (2d Cir. 1992) (internal quotation marks and citations omitted). When an
arbitration clause is broad, then "any subsequent construction of the contract and of the
parties' rights and obligations under it are within the jurisdiction of the arbitrator."
*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832
(2d Cir. 1988) (citations omitted).

NBT argues that the Arbitrator exceeded his authority by "going beyond the
scope" of the Demand for Arbitration and "entering an [a]ward for [Mr.] Durkee on a

11

never-pled and never-advocated breach of contract claim[.]" (Doc. 19 at 12.) Mr. Durkee counters that the Arbitrator properly decided his claim on contract law principles because the Arbitrator had authority to construe the Transition Agreement and "decide the sole issue upon which Mr. Durkee grounded his Complaint[:] NBT's withholding of money that had already vested, and thus already legally belonged to him." (Doc. 21 at 4.)

The Demand for Arbitration in this case described the issues to be arbitrated as follows: "The nature of the claim and damages sought are set forth in the Complaint referenced above and in the possession of the parti[e]s and Arbitrator. Mr. Durkee seeks the principal amount set forth in the Complaint, plus interest, attorney's fees[,] and costs." (Doc. 19-1 at 2, ¶ 3.) In the Complaint, Mr. Durkee asserted a single cause of action for conversion and alleged that "in a fit of pique, [NBT] found a way to steal assets owned by Mr. Durkee in order to punish him in an extra-contractual manner. Specifically, [NBT] took $258,481.67 from Mr. Durkee's pension replacement deferred compensation account. [NBT] had no basis to take the money." (Doc. 7 at 4, ¶ 16.) Mr. Durkee alleged that "[NBT] never explained the basis for stealing Mr. Durkee's assets. . . . This action does not arise from the Transition Agreement. It is outside the scope of that agreement since the actions taken are not pursuant to the agreement." *Id.* at ¶¶ 19-20.) While the Demand for Arbitration presented conversion as the sole claim for relief, it also presented the central issue to be determined: whether NBT wrongfully took Mr. Durkee's deferred compensation account funds or whether the parties' agreements allowed those funds to be taken.

Under New York law,[2] "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to

_____

[2] New York law governs the Transition Agreement because it incorporated the Employment Agreement's choice of law clause by reference, and therefore, it applies to Mr. Durkee's conversion claim. *See Bausch & Lomb Inc. v. Mimetogen Pharms., Inc.*, 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016) (finding the agreement's choice of law clause applied to the plaintiff's tort claims because it was "sufficiently broad," providing that "this [a]greement and all claims related to it . . . shall be construed and governed in all respects according to the laws of the State of New York[]") (alteration adopted) (internal quotation marks omitted); *Cap. Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*, 840 N.Y.S.2d 16, 23 (App. Div. 2007) (finding the

2:23-cv-00274-cr    Document 23    Filed 12/16/25    Page 13 of 20

someone else, interfering with that person's right of possession." *Petrone v. Davidoff Hutcher & Citron, LLP*, 54 N.Y.S.3d 25, 27 (App. Div. 2017) (internal quotation marks and citations omitted). A "key element[] of conversion" therefore is "defendant's dominion over the property or interference with it, in derogation of plaintiff's right[.]" *Id.* (internal quotation marks and citation omitted).

Under New York law, "[t]he essential elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach[.]'" *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47 (App. Div. 2014) (citations omitted). Because the Transition Agreement granted Mr. Durkee the deferred compensation account funds, determining whether NBT was entitled to reclaim those funds, in turn, established whether NBT breached the Transition Agreement. Stated differently, if the Arbitrator found NBT properly took the deferred compensation account funds, Mr. Durkee would have no claim to the funds and his conversion claim would fail. If, on the other hand, the Arbitrator found that NBT improperly took the funds and such conduct was not authorized by the parties' agreements, Mr. Durkee's claim to the funds would succeed. In NBT's reply in support of its motion to compel arbitration, it acknowledged this dispute for arbitration, regardless of how Mr. Durkee framed his claim:

> Moreover, [Mr. Durkee] conveniently overlooks the core merits issues the adjudicator will be asked to resolve, *to wit*, (i) whether the Employment Agreement's non-competition covenant is enforceable as a matter of New York law; (ii) if so, did [Mr. Durkee] materially breach the Employment Agreement by taking a position with one of NBT's direct competitors in violation of the non-competition covenant; and (iii) if so, did [Mr. Durkee] thereby forfeit his right to the income replacement bonus and/or the stock award[?] The common thread, of course, is that all the merits issues turn on an interpretation of the Employment Agreement's non-competition covenant and the Transition Agreement's consideration clause.

agreements' choice of law clauses applied to the plaintiff's tort claims because they "broadly state that Delaware Law governs 'all issues' concerning 'enforcement of the rights and duties of the parties[]'" and "the challenged claims here fall squarely within th[at] broad terminology").

13

(Doc. 12 at 7.)

In arguing that Mr. Durkee's conversion claim was subject to the arbitration clause, NBT stated that "[u]nquestionably, . . . [Mr. Durkee]'s conversion claim depends upon [NBT]'s failure to fulfill its perceived obligations in connection with the agreement, such that if [NBT] had fully complied with the contract, as interpreted by [Mr. Durkee], there would be no tort claim[]" and "[a]t bottom, [Mr. Durkee]'s conversion claim is inextricably intertwined with [NBT]'s performance under the Transition Agreement, and his own performance under the Employment Agreement[.]" *Id.* at 8 (alterations adopted) (internal quotation marks and citations omitted). This court agreed and issued an Entry Order granting NBT's motion to compel arbitration, finding the "dispute is [] squarely within the Arbitration Clause[]" because "[Mr. Durkee]'s entitlement to retain money and stock from NBT is defined in the Transition Agreement, and NBT's basis for revoking this entitlement is the Non-Competition Clause incorporated into the Transition Agreement." (Doc. 17 at 9.)

In arbitration, Mr. Durkee argued that his conversion claim "has no relation to the terms and obligations of either the Transition Agreement or underlying Employment Contract. For that reason, [he] did not bring a separate breach of contract claim." (Doc. 19-6 at 7-8) (citation omitted). In opposition, NBT maintained that Mr. Durkee's claim arose out of the parties' agreements:

> At bottom, [Mr. Durkee]'s conversion "claim is inextricably intertwined with NBT's performance under the Transition Agreement," and his own performance under the Employment Agreement, "such that it must be considered a 'dispute under the Transition and Employment Agreements." *BRM Trades, LLC v. All-Ways Forwarding Int'l, Inc.*, . . . 2022 WL 2788087, at \*9 (S.D.N.Y. July 14, 2022). And, because the Employment Agreement and the Transition Agreement include a broad arbitration clause, the claim is arbitrable whether labeled breach of contract, conversion, or something else. *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987) ("If the allegations underlying the claims 'touch matters' covered by the sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them.").

(Doc. 21-1 at 11-12) (alterations adopted).

14

Although the specific claim of breach of contract was not submitted to arbitration, as the Arbitrator found, contract law dictated the appropriate outcome:

> Mr. Durkee has consistently claimed that the taking of his deferred compensation was wrongful. His labeling that claim as conversion, and NBT's success in establishing instead that contract law governs his claim, does not defeat his underlying factual assertions of NBT misconduct. Instead, it requires that I address the factual basis of the claim under the controlling legal standards.

(Doc. 19-4 at 13.)

Courts in the Second Circuit "ha[ve] made clear that the arbitrator should address the 'real substance' of the parties' dispute regardless of the precise way in which the parties had previously framed the issue." *Ragusa v. ACME Markets, Inc.*, 2025 WL 1446893, at \*6 (S.D.N.Y. May 20, 2025) (citing *A&A Maint. Enter., Inc. v. Ramnarain*, 982 F.3d 864, 869 (2d Cir. 2020)). For example, "even where a specific claim is not asserted in extreme detail in the original Statement of Claim, it remains within the arbitration's scope, so long as the issue is generally submitted to arbitration[.]" *Miss Universe L.P., LLLP. v. Monnin*, 952 F. Supp. 2d 591, 601 (S.D.N.Y. 2013) (citations omitted). Indeed, "the Second Circuit has squarely rejected arguments 'focusing unnecessarily on form over substance' in the arbitration context[.]" *Ragusa*, 2025 WL 1446893, at \*6 (citing *A&A Maint. Enter., Inc.*, 982 F.3d at 869). Accordingly, "[a]ny issue that is 'inextricably tied up with the merits of the underlying dispute' may properly be decided by the arbitrator." *Dighello v. Busconi*, 673 F. Supp. 85, 87 (D. Conn. 1987), *aff'd,* 849 F.2d 1467 (2d Cir. 1988) (citation omitted).

*Key Investment Services LLC v. Oliver*, 2025 WL 1523350 (2d Cir. May 29, 2025), is instructive. There, the plaintiff brought a Financial Industry Regulatory Authority ("FINRA") arbitration proceeding against the defendant, alleging that the defendant made defamatory statements concerning the plaintiff's departure from the defendant's employ. *Id.* at \*1. The plaintiff's statement of claim sought the following forms of relief: expungement of the defamatory statements, damages for lost compensation due to the hostile and retaliatory work environment and defamatory

statements, and punitive damages. *Id.* In addition to awarding the plaintiff compensatory damages on those grounds, the arbitration panel also awarded the plaintiff $100,000 for the defendant's violation of FINRA. *Id.* Although the plaintiff had not requested this relief, the Second Circuit found the arbitration panel did not exceed its authority by providing it:

> [The defendant] makes much of the fact that [the plaintiff] did not assert a claim or seek relief based on [the defendant]'s failure to comply with FINRA Notice 10-39 . . . . While it is true that an arbitrator may exceed [his or her] authority by "considering issues beyond those the parties have submitted for [his or her] consideration," courts have recognized that "any issue that is 'inextricably tied up with the merits of the underlying dispute' may properly be decided by the arbitrator." Here, there is no question that the issue of [the defendant]'s compliance with FINRA Notice 10-39 directly bore on [the plaintiff]'s defamation claim. During the arbitration, [the plaintiff] pointed to the notice as critical to his claim, since it explained how [the defendant] was required to submit truthful and complete information on [the plaintiff]'s Form U-5 – and to update that information upon learning facts that would render its prior filing inaccurate or incomplete – after [the plaintiff]'s departure. [The defendant], in turn, asserted in its defense that it had complied with its FINRA obligations as reflected in that notice. Indeed, [the defendant] does not meaningfully explain how the [arbitrator] could have awarded damages for defamation – as it did in this case – without first concluding that [the defendant] had run afoul of FINRA Notice 10-39 when it filed and later amended [the plaintiff]'s Form U-5.

*Id.* at *2 (alterations adopted) (internal citations omitted). For those reasons, the court held the defendant did not satisfy "its 'very high' burden of showing that the [arbitration p]anel exceeded its authority in issuing the $100,000 separate award in the way that it did." *Id.* at 3. (citation omitted).

    *Oliver* dictates a similar outcome here. In this case, the Demand for Arbitration identified the question of whether NBT wrongfully took Mr. Durkee's deferred compensation account funds as a central issue for arbitration. And while Mr. Durkee asserted a conversion claim, NBT counterclaimed for breach of contract. Thereafter, both parties proceeded in accordance with their shared belief that the contracts they entered

into governed their rights and responsibilities. Before this court[3] and throughout arbitration, NBT argued Mr. Durkee's claim was grounded in contract law and claimed its own "obligation to fulfill its outstanding obligations under the Transition Agreement was excused[]" because Mr. Durkee breached the non-competition covenant. (Doc. 19-3 at 24-25.) As in *Oliver*, the Arbitrator could not have determined Mr. Durkee's claim "without first concluding that" NBT breached the Transition Agreement by taking the deferred compensation account funds. *Oliver*, 2025 WL 1523350, at *2. Accordingly, the Arbitrator properly based his decision on contract principles and adequately explained his findings.

For the foregoing reasons, the court finds that the Arbitrator acted within the scope of his authority and did not "effectively dispense[] his own brand of industrial justice[.]" *Stolt-Nielsen S.A.*, 559 U.S. at 671 (alteration adopted) (internal quotation marks and citation omitted).

## C.    Whether the Arbitrator Manifestly Disregarded the Law.

"The 'manifest disregard' test requires 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (citation omitted). "To succeed in challenging an [arbitration] award under the manifest disregard standard, a party must make 'a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the

---

[3] NBT had full notice of the relevant issues and argued in this court that Mr. Durkee's assertion of a conversion claim was in effect an effort to avoid arbitration required by the parties' agreements:

> Although [Mr. Durkee]'s entitlement to the underlying funds and stock units allegedly converted is directly or indirectly sourced in [the Transition Agreement], [Mr. Durkee] carefully avoids alleging a claim for breach of contract. Why? Because he is seeking to escape the broad arbitration clause incorporated into the Retirement Agreement through his Employment Agreement[.]

(Doc. 10-1 at 1.) Prior to and during arbitration, NBT argued that "at bottom [Mr.] Durkee is advancing a claim for breach of contract masked as a tort claim sounding in conversion." (Doc. 19-3 at 19.)

outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.'" *Seneca Nation of Indians*, 988 F.3d at 626 (quoting *Schwartz*, 665 F.3d at 452). "In addition to this 'subjective component,' a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well[-]defined, explicit, and clearly applicable.'" *Id.* (quoting *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 209 (2d Cir. 2002)).

NBT argues that "[i]f the Interim Award can somehow be construed as finding for [Mr.] Durkee on the conversion claim alleged in the Demand for Arbitration . . . that finding would be subject to vacatur as rooted in a manifest disregard of the law[,]" (Doc. 19 at 12), because a breach of contract alone is insufficient to support a claim of conversion, and "the Arbitrator found NBT guilty of nothing more than a breach of contract[.]" *Id.* at 14. Mr. Durkee does not dispute that the Interim Award cannot be construed as awarding him relief based on his conversion claim and concedes that "the Arbitrator determined that [his] conversion claim was more appropriately analyzed pursuant to breach of contract principles[.]" (Doc. 21 at 6-7.) The court agrees that the Arbitrator awarded Mr. Durkee damages based on a breach of contract theory.

Under New York law, it is well-established that a claim of conversion "cannot be predicated on a mere breach of contract[.]" *Kopel v. Bandwidth Tech. Corp.*, 868 N.Y.S.2d 16, 17 (App. Div. 2008). "While a cause of action alleging conversion cannot be predicated upon a mere breach of contract, the contracting party may also be held liable in tort where the conduct which constitutes a breach of contract also constitutes a breach of a duty distinct from, or independent of, the breach of contract[.]" *Connecticut New York Lighting Co. v. Manos Bus. Mgmt. Co., Inc.*, 98 N.Y.S.3d 101, 103 (App. Div. 2019) (citations omitted). It is undisputed that NBT took funds from Mr. Durkee's deferred compensation account without his consent, which extends beyond a mere breach of contract. Because the Arbitrator's award was adequately tethered to New York law, the court finds that the Arbitrator did not manifestly disregard it.

18

### D.    Whether NBT is Entitled to Attorney's Fees.

NBT argues that it is entitled to attorney's fees under the Transition Agreement as the only prevailing party because Mr. Durkee was not awarded damages based on his original claim of conversion and thus did not prevail on his Complaint. In opposition, Mr. Durkee argues that he is the prevailing party entitled to attorney's fees because NBT only obtained $1 in nominal damages while he received $339,743.99 in damages.

The Arbitrator declined to award attorney's fees to either NBT or Mr. Durkee, finding neither was the prevailing party. He provided a reasoned explanation for this conclusion. Awarding or denying attorney's fees was within the scope of arbitration set forth by the arbitration clause and the parties' arbitration filings. *See* Doc. 10-3 at 16, § 16 ("In the event litigation is commenced to enforce any of the provisions hereof, . . . the prevailing party shall be entitled to recover reasonable attorney['s] fees."); Doc. 19-1 at 2, ¶ 3 ("Mr. Durkee seeks . . . attorney's fees and costs."); Doc. 19-3 at 32 ("NBT should be awarded nominal damages as well as attorney['s] fees[.]"). The arbitrator therefore acted within his authority by refusing to award attorney's fees. *See T.Co Metals, LLC*, 592 F.3d at 346 ("[The] inquiry under § 10(a)(4) 'focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue.'") (citations omitted).

For the foregoing reasons, the court finds the Arbitrator did not manifestly disregard the law or exceed his authority by declining to award attorney's fees.

### E.    Whether the Court Should Impose Sanctions on NBT.

Mr. Durkee "requests that the [c]ourt *sua sponte* impose sanctions upon NBT for bringing the instant motion, pursuant to its Fed. R. Civ. P. 11(c)(3) authority, on the basis that NBT's motion is frivolous and needlessly increases the costs of this litigation." (Doc. 21 at 10.) Under Fed. R. Civ. P. 11(c)(3), on its own initiative, a court "may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Rule 11(c)(3) therefore allows a court to sanction an attorney *sua sponte* if they violate Rule 11(b) by filing a motion that is frivolous or by

19

filing a motion "for any improper purpose, such as to . . . needlessly increase the cost of litigation[.]" Fed. R. Civ. P. 11(b)(1). "[T]he standard for triggering sanctions under Rule 11 is 'objective unreasonableness[.]'" *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 178 (2d Cir. 2012).

As the Second Circuit has explained, "to constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify[,] or reverse the law as it stands. Thus, not all unsuccessful legal arguments are frivolous or warrant sanction." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir. 1990) (internal citation omitted). It is not clear that NBT's motion to vacate the Final Award had no reasonable chance under existing precedent, and Mr. Durkee advances no arguments to support such a finding. It is likewise not clear that NBT filed its motion to needlessly increase the costs of litigation. Mr. Durkee cites no facts that would support such a finding. NBT prevailed on its breach of contract counterclaim and was awarded the nominal damages it requested.

Against this backdrop, the court declines to impose sanctions upon NBT *sua sponte* for filing its motion to vacate, in part, the arbitration award.

## CONCLUSION

For the reasons stated above, the court DENIES NBT's motion to vacate, in part, the arbitration award. (Doc. 18.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of December, 2025.

Christina Reiss, Chief Judge
United States District Court

20